UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  08-20659-CIV-MARTINEZ-BROWN**

MAERSK LINE,

       Plaintiff,

vs.

FIREPOWER DISPLAYS UNLIMITED, INC.,

       Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

THIS CAUSE came before the Court upon Plaintiff's Motion for Summary Judgment

**(D.E. No. 16)**.  Plaintiff Maersk Line ("Plaintiff" or "Maersk"), an ocean carrier, has filed suit

against Firepower Displays Unlimited, Inc. ("Defendant" or "Firepower") to recover demurrage

charges in the amount of $20,700.00.  Firepower has filed a counterclaim against Maersk,

alleging that Maersk breached an agreement with Firepower to ship its fireworks to the

Dominican Republic by a specific date.  Plaintiff Maersk now moves for summary judgment on

its claims asserted against Firepower and on Firepower's counterclaim.  For the reasons set forth

below, the Court grants in part and denies in part Plaintiff's Motion for Summary Judgment.

## I.  Relevant Factual and Procedural Background[1]

On December 8, 2006, Maersk issued bill of lading number 851776163 for the shipment

of container numbers PONU8108722 and TTNU9946070 from Hong Kong, China to Miami,

---

[1]This section provides a brief recitation of the background in this case.  The facts are
discussed in more detail in the analysis section.

Florida on board the vessel "Sally Maersk."  (D.E. No. 27, Joint Pretrial Stipulation at 5); (D.E. No. 16-4).  The shipper under the bill of lading was Shogun (USA) Pyrotechnics Ltd. and the consignee under the bill of lading was Firepower.  *Id*.

On December 29, 2006, the containers arrived at the Port of Miami.  (D.E. No. 27, Joint Stipulation at 7).  On February 23, 2007, Maersk received all of the appropriate documents to ship the cargo to the Dominican Republic.  *Id*.  Bill of lading number 511847306 was issued for the shipment of the containers from Miami, Florida to the Port of Rio Haina in the Dominican Republic.  (D.E. No. 16-13, Exh. 11).  Firepower is listed as the shipper on this bill of lading.  *Id*. The containers were loaded on board the Maersk "Garloch" for shipment from the Port of Miami to the Port of Rio Haina in the Dominican Republic on February 26, 2007.  (D.E. No. 27, Joint Stipulation at 7).  The containers were discharged from the vessel to Maersk's container yard on March 15, 2007, and Firepower took actual delivery of the goods on April 3, 2007.  (D.E. Nos. 16-2 at ¶ 25; 16-15, Exh. 13).

On March 12, 2008, Maersk filed a one-count complaint against Firepower seeking unpaid demurrage charges for the period of time that the two containers of fireworks remained at Maersk's facility in Miami until they were shipped out to the Dominican Republic. On April 4, 2008, Firepower answered this complaint and filed a counterclaim against Maersk, alleging that Maersk breached a "booking agreement"[2] to deliver the fireworks to the Dominican Republic by a specific time.  Firepower alleges that under the first booking agreement Maersk had to deliver the containers on February 1, 2007; however, because "Maersk failed to obtain the proper

---

[2]Nothing in the record is labeled a "booking agreement;" however, there are documents labeled "booking confirmation"(D.E. No. 16-3, Exh. 1) and "booking acknowledgement" (D.E. Nos.16-9, Exh. 7; 16-10, Exh. 8; 16-11, Exh. 9; 20-2 at 1).

clearances for this booking agreement," Maersk had "to generate another booking agreement for a later date." (D.E. No. 4 at 2).   Firepower alleges that under this second booking agreement the containers were to arrive in the Dominican Republic on February 15, 2007.  Firepower alleges, however, that Maersk failed to meet this second deadline and that "the fireworks arrived at the final destination too late to be used in the commercial display, causing Firepower to loose [sic] the sale of the cargo." *Id*. at 2.  Firepower claims damages in the amount of $87,653.00 for their lost profits and the cost of shipment.  Plaintiff Maersk has now moved for summary judgment.

## II. Legal Standard

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Anderson*, 477 U.S. at 248;  *Matsushita Electric Indus. Co.,* 475 U.S. at 586.  It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248.  In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id*. at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991). The moving party "'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)). *See also* Fed. R. Civ. P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Id*. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324. Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)).

A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### III. Analysis

Plaintiff has moved for summary judgment on both its claim for unpaid demurrage and on Defendant's counterclaim for breach of an agreement.  After careful consideration, the Court finds that Plaintiff's motion should be denied as to Plaintiff's claim for demurrage but granted as to the counterclaim for breach of an agreement.

### A.      Plaintiff Maersk's Claim for Demurrage

First, Plaintiff Maersk has moved for summary judgment on its claim for demurrage against Firepower.  On December 8, 2006, Maersk issued bill of lading number 851776163 for the shipment of two containers of fireworks from Hong Kong, China to Miami, Florida on board the vessel "Sally Maersk."  (D.E. No. 27, Joint Pretrial Stipulation at 5); (D.E. No. 16-4, Exh. 2).  "A 'bill of lading' is the contractual agreement between a shipper and a carrier; it also serves as a negotiable document of title."  *Crowley Am. Transp., Inc. v. Richard Sewing Mach., Co.*, 172 F. 3d 781, 783 n.2 (11th Cir. 1999).  Here, with respect to the first bill of lading, Maersk is the carrier and Firepower is the consignee who is also bound by the terms of the bill of lading.[3]  *See Kanematsu Corp. v. M/V Gretchen W*, 897 F. Supp. 1314, 1316 (D.Or.1995) (finding a consignee was bound by the terms of a bill of lading); *see also All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1432 (9th Cir.1993) ("Plaintiff's initiation of the suit constituted

---

[3]The Court notes that Firepower has not disputed that it is bound by the bill of lading as consignee.  On the second bill of lading, Firepower is listed as the shipper.  See (D.E. No. 16-13, Exh. 11).

acceptance of the terms of the . . . bills of lading.")

Clause 2 of the bill of lading states in relevant part that "[t]he terms and conditions of the

Carrier's applicable Tariff are incorporated herein.  Attention is drawn to the terms therein

relating to free storage time and to container and vehicle demurrage or detention."  (D.E. No. 16-

4, Exh. 2 at 3).  Here, Maersk's applicable tariff provides for five calendar days of free storage,

"excluding Saturday, Sunday and holidays falling within [the] free-time period."  (D.E. No. 29-2

at 31).  It also states that "[a]fter expiration of free time, equipment not removed from base port,

alternate port, point OR rail ramp will be assessed demurrage charges upon expiration of free

time.  Demurrage charges shall apply per calendar day including Saturdays, Sundays and

holidays."  (D.E. No. 29-2 at 35).

It is undisputed that Firepower's containers arrived in Miami on December 29, 2006 and

remained at a Maersk facility until February 26, 2007, when the containers were loaded on board

the Maersk "Gairloch" and shipped to the Dominican Republic.  (D.E. No. 16-2 at 4,6); (D.E. No.

27, Joint Stipulation at 7).  However, Firepower argues that it is not responsible for the demurrage

charges.  Specifically, Firepower argues that the containers remained at the Maersk facility despite

the fact that it provided Maersk with all of the relevant documentation to ship the containers to the

Dominican Republic.  After careful consideration, the Court finds there are genuine issues of

material fact as to this issue.

Clause 15.3 of the bill of lading provides in relevant part that it was Firepower's

responsibility to "comply with all regulations or requirements of customs, port and other

authorities, and . . . [that it had to] bear and pay all duties, taxes, lines, imposts, expenses or

losses."  (D.E. No. 16-4, Exh. 2 at 3).  In order to ship the goods from Miami to the Dominican

Republic, Maersk required certain documents from Firepower.  In response to Plaintiff's Motion

for Summary Judgment, Firepower has filed an affidavit from Gary Avins ("Avins"), president of

Firepower.  In this affidavit, Avins states that Firepower "provided all necessary documents to

Jamaica[4] while the goods were still in Hong Kong."  (D.E. No. 20-4 at 1). Avins also states that

Firepower provided the "required documents to Maersk on at least three occasions, however,

Maersk delayed in obtaining clearance." *Id*.  Avins also states that "[t]he documents sent to

Maersk on three occasions were the only documents related to the shipment and were in fact the

documents that the goods finally shipped on."  *Id*.

In addition, both parties have filed a series of e-mails between Pierre Castro ("Castro"),

Senior Hazardous Goods Customer Service Specialist for Maersk, and Ruby Alameda

("Alameda"), a Firepower employee.[5]   On January 26, 2007, Alameda sent Castro an e-mail and

attached some documents; however, it is unclear what documents were sent to Castro.  (D.E. No.

20-6 at 1)  She also stated "[l]et me know if you need anything else."  *Id*.  Castro responded to

Alameda on the same day, stating that he still needed "a copy of the Import License for the

Dominican Republic and a copy of the USA Export License."  *Id*.  On February 6, 2007, Alameda

sent Castro another e-mail asking about the status of the shipment stating that she had sent him the

"ATF license and the license for the Dominican Republic as well as the license from the actual

shipper."  *Id*. at 4.  Castro responded stating, "I have only received the invoice and packing list. [I]

[h]ave NOT received Export License from USA to Dominican Republic or the Import License

---

[4]The containers were shipped first to Jamaica and then to the Dominican Republic.

[5]The parties have provided a number of the same e-mails; however, they each also
provide e-mails that the other party has not provided.

issued to your consignee." *Id*.

On February 8, 2007, Castro had apparently received an export license from Firepower but

sent an e-mail to Alameda indicating that this license needed to be corrected. The e-mail states

"[t]he shipper is reading as Shogun but the export license is for Foshan. Please have the relevant

parties correct this problem." *Id*. at 5; (D.E. No. 16-11, Exh. 9 at 4). Alameda responded to

Castro stating that

> [t]hese are the documents that accompanied the shipment to begin with. These
> containers left China, arrived in California, and are now being reexported to the
> Dominican Republic. When Maersk shipped from China, these were the
> documents they shipped with. I will ask the shipper if they have anything else. But
> I don't see why this is being made so difficult.

(D.E. No. 20-6 at 7); (D.E. No. 16-11, Exh. 9 at 4). Castro responded to this e-mail stating in

relevant part that "[t]he problem is that this shipment, while it is a transhipment for you, for

Maersk, the cargo ended here in Miami. Now the [sic] you are exporting from the USA to the

Dominican Republic, and the export license needs to be issued from the US, and to . . . [the] D.R.

I believe China does not play a roll [sic] anymore." *Id*.

On February 16, 2007, Castro again e-mailed Alameda stating that he had "not received or

seen any . . . [revisions] to the Export & Import Licenses. There containers can not [sic] be

shipped until correct documentation is received." (D.E. No. 20-5); (D.E. No. 16-11, Exh. 9 at 3).

Castro asked Alameda to "arrange to fix/update the licenses so that your fireworks may be

exported." *Id*.[6] Alameda responded stating:

> When we ship to the Caribbean, we usually just use our BATF License. We have
> never needed an Export License. I sent you the Import License for the Dominican

---

[6]In this e-mail, Castro also noted that demurrage had been accumulating on the
containers. (D.E. No. 20-5); (D.E. No. 16-11, Exh. 9 at 3).

> Twice.  Let me know what I need to do in order to have these containers ship.  I will resend you the Import License and the BATF License.  I have shipped containers before and never had this problem.  I don't understand what is different about these containers.

(D.E. No. 20-6 at 8); (D.E. No. 16-11, Exh. 9 at 3).  Sometime later that day, Alameda sent Castro some licenses.  (D.E. No. 16-11, Exh. 9 at 8).  However, it is unclear what licenses or documents were actually sent to Castro.  On February 21, 2007, Alameda sent Castro another e-mail stating that she was attaching a revised invoice and packing list.  (D.E. No. 21-2 at 32).

After careful consideration, the Court finds that Avins' affidavit and the series of e-mails provided by the party demonstrate that there are genuine issue of material fact as to exactly what documents were required for the shipment of the containers to the Dominican Republic, as to what documents Maersk received from Firepower and when, and as to what documents the containers actually shipped on.  For these reasons, the Court finds that summary judgment on this issue is inappropriate.

**B.      Defendant's Counterclaim for Breach of Agreement**

Plaintiff has also moved for summary judgment on Defendant's counterclaim for lost profits and the cost of shipping based on the late arrival of the containers in the Dominican Republic, arguing again that it was not responsible for the delay, that the statute of limitations bars this claim, and that these claims are barred by the exculpatory clause in the bills of lading.  For the reasons stated above, the Court finds there are genuine issues of material fact as to whether the delay in the shipping was Plaintiff's fault.  The Court also finds that Defendant's counterclaim is not barred by the statute of limitations. However, the Court does find that summary judgment is

warranted on Defendant's counterclaim based upon the exculpatory clauses in the bills of lading.[7]

### 1.        Statute of Limitations

First, Plaintiff argues that Defendant's counterclaim is barred by the one-year statute of

limitations contained within the Carriage of Goods by Sea Act, Ch. 29, 49 Stat. 1207 (1936)

*reprinted in* note following 46 U.S.C. § 30701 ("COGSA").[8]  Defendant has argued that the

Harter Act, 46 U.S.C. §§ 30701 *et seq.* ("Harter Act") and not COGSA applies to its claim.

COGSA "governs a carrier's duty from the time of loading to the time of discharge; the Harter Act

governs a carrier's duty from the time of discharge to the time of delivery." *Crowley Am. Transp.*,

172 F. 3d at 785 n.6.  Here, it is undisputed that at the time the action at issue occurred, the

containers had been discharged or unloaded.  Thus, normally the Harter Act would apply to this

action; however, both bills of lading contains a clause paramount.

Clause 5.3 of the bills of lading states in relevant part that "where US COGSA applies

then the provisions stated in the said Act shall govern before loading on the vessel or after

discharge therefrom, as the case may be."  (D.E. No. 16-4, Exh. 2 at 3); (D.E. No. 16-3, Exh. 11 at

3).  "[M]any courts have upheld contractual extensions of COGSA by the Harter Act, as long as

---

[7]In an abundance of caution, in the discussions regarding the counterclaim, the Court
makes reference to both bills of lading in this case which includes the bill of lading, numbered
851776163 and issued for the shipment of the containers from Hong Kong, China to Miami,
Florida and the second bill of lading, numbered 511847306 and issued for the shipment of the
containers to the Dominican Republic. *See* (D.E. Nos. 16-4 and 16-13).  Both bills of lading
contain the same clauses and provisions discussed in this order.  *See id*.

[8]COGSA was originally codified at 46 U.S.C. §§ 1300-1315 and then later codified as an
appendix to 46 U.S.C. §§1300-1315.  On October 6, 2006, the United States Congress passed
Public Law 109-304, with the stated purpose of "reorganizing and restating the law currently in
the appendix to title 46" and COGSA was moved to its current position.  Pub. L. 109-304, 120
Stat. 1485 § 2(a). Throughout this Order, COGSA will be cited simply by section number.

COGSA does not conflict with the Harter Act." *PT Indonesia Epson Indus., v. Orient Overseas Container Line, Inc.*, 219 F. Supp. 2d 1265, 1270 (S.D. Fla. 2002).  This Court finds that COGSA's one-year statute of limitations is not inconsistent with the Harter Act. *See Uncle Ben's Int'l Div. of Uncle Ben's, Inc. v. Hapag-LLoyd Aktiengesellschaft,* 855 F.2d 215, 217 (5th Cir. 1988) (finding that COGSA's statute of limitations is consistent with the Harter Act.).[9]

Section 6 of COGSA provides that "the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered."  Plaintiff argues that the goods were delivered when they were discharged on March 15, 2007 at the Port of Rio Haina in the Dominican Republic, and Defendant argues that the goods were delivered on April 3, 2007 when Firepower actually picked up the containers.  The Court finds it unnecessary to resolve the question of when delivery under section 6 of COGSA occurred. Defendant's counterclaim is a compulsory counterclaim pursuant to Federal Rule of Civil Procedure 13(a)(1)(A) and thus, it relates back to the original filing of this case which occurred on March 12, 2008, less than a year before either date argued by the parties to be the date of delivery.  *See Employers Ins. of Wausau v. United States*, 764 F. 2d 1572, 1576 (Fed. Cir. 1985) ("The institution of a plaintiff's suit suspends the running of limitations on a compulsory counterclaim while the suit is pending."); *Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 389 (4th Cir.1982) (same).  Thus, Defendant's counterclaim is not barred by the statute of limitations.

---

[9]Indeed, Defendant agrees that a one-year statute of limitations such as the one found in COGSA may be applied in this case.  *See* (D.E. No. 20 at 4).

### 2.   Exculpatory Clause

Plaintiff also argues that it is entitled to summary judgment on Defendant's counterclaim

because it specifically disclaimed liability for a delayed shipment in the bills of lading.  The bills

of lading for the two containers for the shipment from Hong Kong to Miami and then from Miami

to Rio Haina both provide in relevant part:

> 8. General
> 8.1    The Carrier does not undertake that the Goods or any documents relating
> thereto shall arrive or be available at any point or place at any stage during the
> Carriage or at the Port of Discharge or the Place of Delivery at any particular time
> or to meet any particular requirement of any license, permission, sale contract, or
> credit of the Merchant or any market or use of the Goods and the Carrier shall
> under no circumstances whatsoever and howsoever arising be liable for any direct,
> indirect or consequential loss or damage caused by delay.

(D.E. No. 16-4, Exh. 2 at 3); (D.E. No. 16-13, Exh. 11 at 3).  Thus, the Court agrees that the

contracts clearly disclaim any liability arising from a delayed shipment.  However, Defendant

argues that the Harter Act renders this provision void.  Plaintiff argues that this provision is not

inconsistent with either the Harter Act or COGSA.

As discussed above, the bills of lading contain a clause paramount providing that the

COGSA applies to periods where the Harter Act would traditionally apply.  (D.E. No. 16-4, Exh.

2 at 3); (D.E. No. 16-9, Exh. 11 at 3).  Such a clause is valid as long as the COGSA is not

inconsistent with the Harter Act with regard to the area to which it is being applied.  *PT Indonesia*

*Epson Indus*., 219 F. Supp. 2d at 1270.  Here, the Court agrees with Plaintiff and finds that under

both the Harter Act and COGSA the exculpatory provision is valid.

The Harter Act provides:

> A carrier may not insert in a bill of lading or shipping document a provision
> avoiding its liability for loss or damage arising from negligence or fault in loading,

-12-

stowage, custody, care, or proper delivery. Any such provision is void.

46 U.S.C. § 30704.  Similarly, COGSA provides:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or
> the ship from liability for loss or damage to or in connection with the goods,
> arising from negligence, fault or failure in the duties and obligations provided in
> this section, or lessening such liability otherwise than as provided in this chapter
> [this note], shall be null and void and of no effect.  A benefit of insurance in favor
> of the carrier or similar clause, shall be deemed to be a clause relieving the carrier
> from liability.

Section 8 of the COGSA.

First, applying the Harter Act to the exculpatory provision at issue, the Court finds that

Clause 8.1 is not void.  The Harter Act's provision prohibiting certain exculpatory clauses applies

to negligence or fault in "loading, stowage, custody, care, or proper delivery."  Here, Clause 8.1,

which disclaims liability for delay could only possibly relate to "proper delivery."  However, the

term "proper delivery" in the context of the Harter Act is defined as "discharge of the cargo upon

a fit and customary wharf."  *Allstate Ins. Co. v. Imparca Lines*, 646 F. 2d 166, 168 (5th Cir.

1981).[10]  Thus, this term does not apply to any delay in the delivery of the goods.

Moreover, even if this Court were to construe the term "proper delivery" as delivery in

conformance with the contracts, there is no provision in the bills of lading establishing a particular

time that the goods were to be delivered to the Dominican Republic.  Although the booking

acknowledgments issued on December 18, 2006, January 12, 2007, and February 16, 2007,

provide an "ETA" or estimated time of arrival for the containers to arrive in the Dominican

Republic, these are only estimates.  (D.E. No. 16-9, Exh. 7); (D.E. No. 16-10, Exh. 8); (D.E. No.

---

[10]In *Bonner v. Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior
to October 1, 1981.

16-11, Exh. 9).  Each of these booking acknowledgments unequivocally states that "[a]rrival, berthing, departure and transit times are estimated and given without guarantee and subject to change without prior notice" and that "[a]ll dates/times are give as reasonable estimates only and subject to change."  *Id*.  Moreover, these estimates are contained in a document which is labeled merely as an "acknowledgment," and these estimates are not incorporated into either bill of lading issued in this case, which are the relevant contracts.  Finally, the bills of lading state in Clause 25 that the contract may only be modified in writing.  (D.E. No. 16-4, Exh. 2 at 3); (D.E. No. 16-13, Exh. 11 at 3).  Neither party has presented any written modifications of the bills of lading.  Thus, there is no indication that a requirement of "proper delivery" in this case included a specific time of delivery.[11]  Thus, the Court does not find that the Harter Art invalidates the exculpatory clause as it has not "avoided" liability with respect to any "negligence or fault in loading, stowage, custody, care or proper delivery."

Similarly, the Court also finds that section 8 of COGSA does not invalidate the exculpatory provision in Clause 8.1 of the bill of lading. Section 8 of COGSA provides that a carrier may not relieve itself of liability for "obligations provided in this section, or lessening such liability otherwise than as provided in this chapter [this note]."  The exculpatory provision in the bill of lading does not do this.  COGSA does not require that goods be delivered by a specific time and there are no provisions in COGSA relating to delay.  Thus, a provision disclaiming liability for delay is not in conflict with COGSA and is not void under section 8.  *See Fratelli Ricatto Import & Export Co., Inc. v. S.S. Torm Birgitte*, No. 99-8721, 2000 U.S. Dist. LEXIS 9969, at *5

---

[11]In addition, as Defendant has counterclaimed for breach of an "agreement" to deliver the goods at a specific time and the Court finds there was no agreement relating to the time of the delivery, Defendant would also not be entitled to relief for this reason.

(S.D.N.Y. July 19, 2000) (stating that "[b]ills of lading containing terms that specifically exclude liability for delay in arrival of cargo are binding and do not violate COGSA."); *Quesoro USA, Inc. v. Lykes Bros. Steamship Co.*, No. 93-2239, 1995 U.S. Dist. LEXIS 7468, at *3 (S.D.N.Y. June 1, 1995) (finding that plaintiff's claim was barred by the bill of lading as the bill of lading disclaimed "any duty to deliver the shipment in time for a particular market."). Thus, Clause 8.1of the parties' contracts is also not invalid under COGSA. For these reasons, the Court finds the exculpatory clause is applicable and grants Plaintiff summary judgment on Defendant's counterclaim. Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that

Plaintiff's Motion for Summary Judgment **(D.E. No. 16)** is **GRANTED in part and DENIED in part**. A final judgment on the Defendant's counterclaim will be entered by separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 17 day of November, 2008.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record